Michael J. MARKOWSKI, Petitioner,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

No. 1446, Docket 93–4182.

United States Court of Appeals, Second Circuit.

Argued May 13, 1994.

Decided Sept. 2, 1994.

Michael J. Markowski, pro se.

Susan S. McDonald, Washington, DC, S.E.C., for respondent.

Before NEWMAN, Chief Judge, JACOBS and LEVAL, Circuit Judges.

JACOBS, Circuit Judge:

Petitioner Michael Markowski, *pro se*, petitions for judicial review pursuant to 15 U.S.C. § 78y(a)(1) of an order of the Securities and Exchange Commission ("SEC") sustaining disciplinary action taken against him by the National Association of Securities Dealers, Inc. ("NASD"). These disciplinary proceedings arose from a series of confrontations in March and April 1991, between staff of the NASD and the representatives of Global America Inc. ("Global"), a member of the NASD that had ceased brokerage operations and was then winding down its business. Markowski was at that time the Chairman of Global, its Chief Executive Officer, and the majority stockholder in Global's parent company, and was himself a member of the NASD. The NASD's staff was seeking immediate on-site access at Global's offices to the books and records Global was required to prepare and maintain, pursuant to SEC Rules 17a-3 and 17a-4, with respect to the 19 securities in which Global made a market.

Following proceedings before the Market Surveillance Committee ("MSC") of the NASD and the National Business Conduct Committee ("NBCC") of the NASD, the SEC affirmed (i) the conclusion of the NBCC that Markowski had violated the NASD's Rules of Fair Practice and (ii) the disciplinary sanctions imposed by the NBCC: a fine of $50,000, a two-year suspension from association with any member firm in any capacity, and a bar on any debt or equity interest in any firm.

In his petition, Markowski contends that he fulfilled any responsibilities he had in respect of the NASD's document demand by delegating responsibility for maintaining and producing documents to a records custodian and by reasonably relying upon advice of counsel. Markowski faults the NASD for failing to locate the proper records custodian and for denying Markowski due process in connection with the hearing before the MSC. Finally Markowski claims that he is the subject of "administrative selective persecution."

## BACKGROUND

Markowski was first registered with the NASD in November 1977. Global became a member in August of 1988 and Markowski registered as General Securities Principal [1] with Global in May 1989. During the time Global operated as a brokerage business, Markowski was Chairman and Chief Executive Officer, and was majority stockholder of its parent company. Net capital deficiencies compelled Global to cease operating as a brokerage business on January 16, 1991. At some point, Markowski took steps to resign as Chairman.

On March 5, 1991, members of the NASD staff arrived at the business premises of Global to conduct an unannounced, on-site inspection of books and records Global was required by the securities laws to prepare and maintain in respect of the 19 stocks of which it made a market. The NASD examiners were met at the door by Markowski's mother, a registered Global representative; Markowski was not present. Mrs. Markowski contacted her son's attorney, Martin H. Kaplan, Esq., who soon arrived at Global's offices and demanded that the examiners put down the books and records, and leave. After some further exchanges, one of Kaplan's law partners summoned the New York City police, who expelled the examiners from the premises. Later on March 5, Daniel M. Sibears, Director of the NASD's Compliance Division, spoke by telephone with Markowski who at that time was working at a securities firm called Paragon Capital Corporation ("Paragon"). In conversations with Markowski on that date, as well as on subsequent days, Sibears protested that the NASD was being denied access to Global's records. Recollections diverge as to what was said in

---

1. Principals are members of the management of broker-dealers "who are actively engaged in the management of the member's investment banking or securities business, including supervision, solicitation, conduct of business or the training of persons associated with a member for any of these functions...." NASD Manual ¶ 17784(1)(b).

conversations between NASD staff and Markowski on March 5; but Markowski concedes this much: that he discussed access to the records on that date with Sibears and that he agreed to meet the examiners at Global's offices the following day to afford them access to the firm's records.

The NASD's examiners appeared on March 6, but no one answered the door. A short while later, the staff received a letter from Mr. Kaplan, either by hand or by fax. Mr. Kaplan characterized Sibears's telephone calls to Markowski as "an effort to end run Global's position", sought to interpose an ethical impediment to further direct contact with Markowski by identifying Leonard Bloom, Esq., as counsel representing Markowski in "this matter," and offered to make Global's records available for review by the NASD staff "subject to reasonable identification of the items sought and a reasonable methodology being agreed to for said production." Kaplan solicited a prompt response to "avoid the need for further disagreement and acrimony" (probably an allusion to the police). Later that day, the examiners went to Paragon's office and delivered a letter addressed to Markowski in which Sibears requested immediate access to records. A woman on the premises accepted the letter on Markowski's behalf. The examiners looked up Markowski's home address in the NASD's federal registration depository, and tried to deliver a copy of the letter to him there, but discovered that he had not lived there for six months or more. Markowski had failed to notify the NASD of his change of address.

Further discussions ensued on March 7 between Sibears and Kaplan's law firm. Sibears telecopied a letter to Bloom stating that the NASD was making a final demand for access to Global's records at 2 p.m. that day. Although Bloom did not respond to the letter, one of Kaplan's colleagues telephoned Sibears and informed him that (i) Global would not provide access to its records on March 7, (ii) some of Global's records would be available for review at Kaplan's law office at 10 a.m. on March 8, and (iii) Sibears would receive a letter later in the day indicating when all of the requested records would be available and describing the "methodology"

Global would follow in making the records available to the NASD. Sibears faxed a letter to Kaplan's colleague "[c]onfirming our conversation of . . . this afternoon" to the effect that "[c]ertain" books and records would be available at the offices of Global's counsel the following morning, and that Global would advise as to when "all of the requested records" would be available to the NASD staff and what "methodology" Global would follow for the document production. Sibears, however, was unable to reach the examiners who were en route to Global's offices; when the examiners arrived there at 2 p.m. on March 7, they were denied access to the records. A fax from Mr. Kaplan the following morning duly noted that the NASD examiners failed to appear at Kaplan's office at the appointed time.

Over the following days, the antagonists exchanged legalistic correspondence expressing dismay and disappointment at each other's conduct, characterizing and recharacterizing each other's offers and positions, and proceeding generally at cross purposes concerning arrangements for the production of the documents. This exchange produced an impasse in which Global undertook to produce less than all of the documents at the offices of its counsel and to comply with all reasonable requests in due course, while the NASD examiners, having been denied on-site review of all records at Global's offices, demanded that all the documents be shipped immediately to Washington.

In the end, Global did not provide the NASD access to any documents until May 17, 1991, after the NASD had instituted disciplinary proceedings and obtained an order of production. Even then, Markowski produced less than all of the requested records; the rest were produced on June 5, 1991, the second day of the disciplinary hearings.

### THE PROCEEDINGS BELOW

On April 9, 1991, a month after the NASD staff first arrived at Global's premises, the Anti Fraud Department of the NASD commenced disciplinary proceedings against Global and Markowski. The complaint before the Market Surveillance Committee alleged violations of Sections 17(a) and 17(b) of

the Securities Exchange Act of 1934, 15 U.S.C. § 78q, and Rule 17a–4 promulgated thereunder, as well as various provisions of the NASD's By–Laws and Rules of Fair Practice.

The disciplinary proceedings before the MSC were instituted on May 13, 1991. On the scheduled date of the hearing, Markowski did not appear; Kaplan did appear, but stated that he was not prepared to go forward and sought a continuance. The continuance was granted. On June 5, the re-scheduled hearing date, Markowski appeared with new counsel, who was also unprepared and who also sought a continuance. The second continuance was denied, and the hearing was conducted. On September 18, 1991, the MSC found that Markowski and Global had (i) violated Section 17(a) and Section 17(b) of the Exchange Act and Rule 17a–4 promulgated thereunder; (ii) failed to comply with the NASD's record-keeping requirements in Article III, Section 21, of the NASD Rules of Fair Practice; (iii) failed to submit to the examination of their books and records, as required by Article IV, Section 5 of the NASD Rules; (iv) failed to observe "high standards of commercial honor and just and equitable principles of trade", as required by Article III, Section 1 of the NASD Rules; and (v) failed to update their registrations to reflect their current addresses, as required by Article IV, Section 2(c) of the NASD By–Laws. The MSC ordered Global expelled from membership and, as to Markowski, ordered that he be fined $50,000, suspended from association with any member firm in any capacity for six (6) months, barred from association with any member in a principal capacity and barred from maintaining a debt or equity interest in any member firm.

Markowski appealed to the NBCC, which set aside the MSC's findings with respect to the record-keeping violations of Sections 17(a) and (b) of the Securities Exchange Act and Article III, Section 21 of the NASD's Rules of Fair Practice. The NBCC affirmed in all other respects except that Markowski's suspension was lengthened from six months to two years. The NBCC modified certain findings of the MSC as follows:

As to the critical events of March 5, 1991, we credit the testimony of the staff that the staff did not engage in an unreasonable search or other violation of the respondent's rights, although we note that when a member firm orders the staff off its premises in response to a request for production of documents pursuant to Article IV, Section 5 of the Rules, a violation is complete and it is unnecessary to test the limits of applicable state property law. We do not consider the fact that the police were called to have been a factor in aggravation of the respondent's violation, but observe that the respondent was notified of the staff's situation at a time when compliance and cooperation could have avoided the confrontation that ensued. We believe that Markowski's decision to temporize when confronted by Sibears' calls on March 5 constituted a refusal to comply, not reliance on counsel. We further believe, as observed by the regional attorney, that Markowski did not rely on advice of counsel in refusing access to the NASD staff on March 5, 1991, since he admitted that he did not consult with Kaplan until that day was over.

As to Markowski's argument that he reasonably relied upon the advice of counsel and the steps taken by Mr. Kaplan on behalf of Global, the NBCC concluded:

Markowski knew or should have known that he could not delegate responsibility for satisfying the investigative demands of the NASD to Kaplan, particularly after learning of the NASD's dissatisfaction with Kaplan's refusal to grant unconditional access.

The NBCC imposed sanctions against Markowski for his violations of Article I\,, Section 5 and Article III, Section 1 of the Rules of Fair Practice, but not for his violation of Article IV, Section 2(c) of the By–Laws. In relevant part, Article IV, Section 5 of the Rules of Fair Practice stated as follows:

For the purpose of any investigation ... any Local Business Conduct Committee, any District Business Conduct Committee, the Board of Governors or any duly authorized member and members of any such

Committees or Board or any duly authorized agent or agents of any such Committee or Board shall have the right ... to investigate the books, records and accounts of any [member of the Corporation] with relation to any matter involved in any such investigation.... No member or person associated with a member shall ... refuse to permit any inspection of books, records and accounts as may be validly called for under this section.

(That version of Section 5 was substantially amended and reworded effective April 15, 1992.)

Markowski appealed the NBCC ruling to the SEC, which which affirmed the disciplinary sanctions on June 30, 1993. On August 23, 1993, Markowski filed a timely petition for review by this Court pursuant to 15 U.S.C. § 78y(a)(1). On September 3, 1993 the SEC granted Markowski a stay of the sanctions pending the disposition of his petition by this Court.

## DISCUSSION

■ Administrative findings of fact are conclusive if they are supported by substantial evidence. *Higgins v. SEC,* 866 F.2d 47, 49 (2d Cir.1989); *see* 15 U.S.C. § 78y(a)(4). "We review conclusions of law for arbitrariness, capriciousness and abuse of discretion." *Higgins,* 866 F.2d at 49.

### A. Delegation

■ Markowski chiefly relies upon *In Re Mark James Hankoff,* 48 S.E.C. 705 (1987), for the proposition that a senior officer of a brokerage firm is responsible for compliance by the firm, but may rely upon the reasonable delegation of particular functions to others, absent knowledge or reason to know of non-compliance by the person to whom the function is delegated. That is a fair statement of the law, but it does not assist Markowski. The facts found below support the view that, as early as March 5, 1991, immediately after the police escorted the NASD examiners from Global's premises, Markowski was made aware that the NASD's demand for access to documents was not being met. Markowski's briefs to this Court repeatedly emphasize that he designated a

competent employee, named Carol Zervoulei, to maintain and produce Global's documents as needed, and that the NASD would have been able to find her and review the documents if the NASD had merely consulted Markowski's designation of her in the NASD's own records. That might have avoided the encounter with the police on March 5. However, Markowski's conduct has not been faulted at any administrative level by reason of anything preceding the phone call on the afternoon of March 5 when Sibears advised Markowski personally of the NASD's unmet demands. At that point, Markowski knew (or certainly should have known) that Ms. Zervoulei was not involved in the NASD's document request. *See Patrick v. SEC,* 19 F.3d 66, 69 (2d Cir.1994) (*per curiam* ) (high-level officers of a broker-dealer responsible for supervision of appointed representatives). It is not altogether clear whether Kaplan thereafter functioned as counsel for Global only or as counsel for Markowski as well, but there is no reason to doubt that Markowski, either individually or as officer of Global, controlled Kaplan or had the power to do so. Markowski therefore cannot evade responsibility for what Kaplan did and did not do. *Id.*

■ It is clear that from the outset the NASD's examiners demanded access to Global's files at Global's premises on an immediate basis. Markowski argues here (and presumably argued below) that "such urgency was inappropriate for the review of books and records of a firm that was winding down." However, the need for urgency may be heightened when it comes to reviewing the books and records of a brokerage firm that has ceased doing business by reason of financial distress. In one of his letters, Kaplan justified his refusal to permit immediate access to Global's books and records on its premises on the ground that the documents were "haphazardly filed and not indexed". But the disarray of business records does not argue forbearance on the part of regulators.

### B. Advice of Counsel

■ Markowski's reliance upon advice of his counsel is misplaced. To invoke this

principle, Markowski has to show that he made complete disclosure to counsel, sought advice as to the legality of his conduct, received advice that his conduct was legal, and relied on that advice in good faith. *SEC v. Savoy Industries, Inc.,* 665 F.2d 1310, 1314 n. 28 (D.C.Cir.1981). Even where these prerequisites are satisfied, such reliance is not a complete defense, but only one factor for consideration. *Id.* In light of the substantial evidence supporting the SEC's findings in this case, Markowski's reliance upon advice of counsel, even if established, would not furnish a ground for reversal.

█ To the extent that Markowski claims reliance on any assurance by Kaplan that the documents were being produced, such assurance is not legal advice and is subject to the same delegation analysis applicable to Ms. Zervoulei.

## C. Procedural Claims

█ Markowski makes a number of procedural attacks on the disciplinary proceedings before the MSC. None requires extended treatment. First, Markowski complains that the MSC's refusal to grant a second adjournment was a denial of due process. Even in a criminal case, however, trial courts have broad discretion as to whether to grant a continuance. *See Morris v. Slappy,* 461 U.S. 1, 12, 103 S.Ct. 1610, 1616–17, 75 L.Ed.2d 610 (1983). Second, Markowski charges that Kaplan should not have been permitted to represent him because Kaplan was a material witness. This claim is meritless for the following (partial) list of reasons: by the time the hearing was conducted, Kaplan had been replaced by another unprepared attorney; in a civil suit, there is no obligation to ensure that a litigant has conflict-free representation, *see Dow Chemical Pacific Ltd. v. Rascator Maritime SA,* 782 F.2d 329, 341 (2d Cir.1986); and the NASD did raise an issue under the Code of Professional Responsibility, Disciplinary Rule 5–102, concerning Kaplan's continuing representation of a client notwithstanding the likelihood he would testify.

Markowski's additional claims—that his rights were violated because he was not permitted to present oral argument or to amend his brief, and that he was a victim of selective prosecution because other employees of Global were not charged—are also meritless.

## D. Sanctions

█ Finally, Markowski challenges the sanctions as too severe in light of the evidence and mitigating factors, and contends that the SEC abused its discretion in affirming the sanctions. However, we will not overturn the setting of sanctions by an administrative body unless the sanctions are "unwarranted in law ... or without justification in fact...." *Butz v. Glover Livestock Commission Co. Inc.,* 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1457–58, 36 L.Ed.2d 142 (1973) (quoting *American Power Co. v. SEC,* 329 U.S. 90, 112–13, 67 S.Ct. 133, 146, 91 L.Ed. 103 (1946)). Although the sanctions imposed do not by their terms permanently bar Markowski from the industry, Markowski complains that the stain of sanctions will in itself be ruinous. We note, however, that Markowski, who first registered with the NASD in 1977, voluntarily submitted himself to the discipline of what is largely a self-regulating association. The Rules of Fair Practice and the powers conferred on the association by those rules allow the NASD to enforce standards of conduct that makes its imprimatur meaningful and commercially valuable to its membership, including Markowski.

## CONCLUSION

For the foregoing reasons the petition for review is denied and the order of the SEC is affirmed.